**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-CR-00087 (BAH)** |
| **v.** | : | |
| | : | |
| **CARSON S. LUCARD,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Carson S. Lucard ("Lucard") to 30 days' incarceration followed by a period of probation of 36 months, sixty hours of community service, and order him to pay $500 in restitution.

**I.     Introduction**

The defendant, Carson S. Lucard, a resident of Norristown, Pennsylvania, participated with Brian Stenz (21-CR-000456 (BAH))[1] in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] On February 17, 2022, this Court sentenced Stenz to 3 years' probation with 14 days consecutive imprisonment as a condition of probation, 2 months of home detention that was also a condition of probation, and $500 in restitution.

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Lucard pleaded guilty to an information charging him with one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol building.  As explained herein, a sentence of 30 days' incarceration followed by a period of probation of 36 months is appropriate in this case.  Lucard first entered the Capitol Building through the shattered window adjacent to the Senate Wing door just three minutes after a police line protecting the door and windows was violently broken by rioters and the area was breached for a *second* time.  He remained in the foyer for approximately 15 minutes during which time he yelled, pointed, and chanted at the U.S. Capitol police guarding the area.[3]  Lucard reentered the building for a second time a few minutes after exiting, this time with Brian Stenz.  Shortly thereafter, Lucard and Stenz entered Senate Office S140, the office of Senator Jeff Merkley.  There Stenz took photographs of the ransacked office.  Lucard and Stenz continued on to the Crypt, where Stenz took more photographs.  The two exited the building approximately 8 minutes later.  In total, Lucard was inside the Capitol building for approximately 23 minutes.  Additionally, Lucard was likely not fully forthcoming when interviewed by the FBI.  Lucard stated that he did not witness any violence or see signs of it, however, Stenz – who Lucard was with – admitted to seeing blood outside the Capitol, seeing rioters break windows, and hearing alarms go off inside the Capitol.  Lucard also admitted to deleting videos of the riot from his phone following January 6, 2021.

The Court must also consider that Lucard's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the Congressional certification proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here,

---

[3] CCTV footage does not contain audio, so the government has been unable to determine what Lucard was saying to police.  He appears at times to be chanting "USA."

Lucard's participation in a riot that halted the Congressional certification, combined with the fact that he entered the building not just once but two times, one of which was just after the second violent breach of the Senate Wing door, and his entry into a United States Senator's office, renders a sentence of 30 days' incarceration followed by a period of probation of 36 months – both necessary and appropriate.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 13 (Statement of Offense), at ¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Lucard's conduct and behavior on January 6.

### Carson Lucard's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Carson Lucard travelled with Brian Stenz to Washington, D.C. from their homes in Pennsylvania to attend the "Stop the Steal" rally.  Lucard and Stenz then followed a crowd to the Capitol Building.  Stenz described to the FBI in an interview with his attorney present that he saw what he believed to be blood in a fountain, observed rioters hanging from the scaffolding outside the Capitol, and saw people breaking windows in order to gain entry to the building.  Lucard, who was likely at Stenz's side when those things happened, almost certainly saw the same violence and destruction.  Lucard nonetheless moved closer to the building and chose to enter.

At 2:50 p.m., Lucard entered the building (without Stenz) via a shattered window adjacent to the Senate Wing door, just three minutes after that area had been violently breached by rioters

for a second time that day.  *See* Exhibit 1 (CCTV video of Senate Wing door where Lucard enters

through window at minute 3:12).  The breach is depicted below in Figure 1, which is a still shot

from Exhibit 1.



Figure 1

In Exhibit 1, Lucard can be seen entering the building through the broken window.  This

is also seen in Figure 2, which is a still shot from Exhibit 1.  Lucard circled in red.



Figure 2

Lucard remained in the foyer for approximately 15 minutes, during which time he intermittently aggressively chanted, and pointed at the U.S. Capitol Police. *See* Figure 2 and Exhibit 1 at minutes 5-6 and 8-9. Lucard likely chanted, "Traitors" at the U.S. Capitol Police. An open-source video from this area of the Capitol shows Lucard pointing at the police, and one can hear other rioters chanting "Traitors." Lucard's face is turned away from the camera at this time as he points at the police officer in front of him. *See* Exhibit 4, at minutes 28:57 through 29:57.



Figure 3

Lucard exited through the Senate Wing door approximately 15 minutes later.  However, he returned shortly thereafter and entered the U.S. Capitol building for a second time.

At 3:07 p.m., Lucard – this time with Brian Stenz – entered the Capitol Building through the Senate Wing door.  *See* Exhibit 2, CCTV.  Figure 4 below is a still shot from Exhibit 2.  Lucard is circled in red, and Stenz in blue.  The two walked past broken glass and an overturned cabinet.



Figure 4

Lucard and Stenz then walked down the hallway seen on the left in Figure 4, making their way further into the Capitol Building but not before stopping in Senate office S140, which is the office of Senator Jeff Merkley.  The government has been unable to determine precisely how long Lucard and Stenz remained in Senator Merkley's office, but the CCTV footage shows it was no more than four minutes. Nonetheless, any amount of time spent in such a sensitive area of the building is significant.

The photograph displayed below as Figure 5 is one that Stenz texted to an acquaintance following his participation in the riot.  The photograph shows what is known to be a chair and bookcase from Senator Merkley's office.



Figure 5

Lucard and Stenz were not the only rioters who entered Senator Merkley's office on January 6.[4]   Later that night, Senator Merkley returned to his office to find that it had been ransacked.  The senator recorded the damage he found and shared it via a video on social media.[5]  *See* Exhibit 3.  The chair and bookcase in Figure 5 above are visible in this video.

---

[4] The Government's Sentencing Memorandum in *United States v. Felipe Marquez*, 21-cr-136 (RC), ECF No. 28 at 8, describes how Marquez entered Senator Merkley's office at around 3:00 p.m., shortly before Lucard did, filmed other rioters smoking in the room, and himself smoked from a vape pen.  Defendant Brandon Fellows also described how "I walked in there's just a bunch of people lighting up in some Oregon room…they were smoking a bunch of weed in there." Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Brandon Fellows,* No. 21-cr-83 (TNM), ECF No. 1 at ¶ 15.

[5] The video can also be viewed here:  https://www.facebook.com/ABCNews/videos/sen-jeff-merkley-shows-damage-done-to-office-after-pro-trump-mob-vandalized-capi/222464836136603/.

In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked.  He pointed out how the floor was littered with debris.  He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall.  He said that the rioters "left a Trump flag here to mark their presence."  Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray.  He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or marijuana joint on the floor.  In Senator Merkley's words, one could "count this office trashed."  *Id*.  Although the Government has uncovered no evidence that Lucard contributed to that damage, his entry into the Capitol building and office S140, at the very least, contributed to the chaos that allowed that damage to occur.

Lucard and Stenz also entered the Crypt of the Capitol Building.  Stenz took a selfie of the pair in that room (with Lucard in the background), seen below as Figure 6.



Figure 6

At approximately 3:15 p.m., eight minutes later, Lucard and Stenz exited the building. Lucard spent a total of 23 minutes inside the Capitol building.

The government acknowledges that a mitigating factor in this case is that Lucard pled guilty to an information on March 16, 2022, shortly after being contacted by the FBI.  However, Lucard was very likely aware of Stenz's arrest, which occurred almost a year earlier on April 30, 2021.

*Lucard's Interview*

Lucard was interviewed by the FBI as a requirement of his plea agreement.  During the interview, Lucard was likely not fully forthcoming about his own conduct or his knowledge of the obvious violence and threat of the crowd to the police at the Capitol that day.

Lucard stated that he decided to go to the Capitol with Brian Stenz in order to protest election integrity.  Lucard stated that he walked to the Capitol after listening to former President Trump's speech because Trump had said to go there to peacefully protest.  He stated that he and Stenz stood on the steps of the Capitol and that he noticed that people were "acting rowdy" near the entrances to the Capitol.  However, he claimed then that people were filing into the building "peacefully."  He admitted to climbing into the building through a broken window but said that "it seemed like the police were allowing people in."  Lucard denied witnessing any violence against police officers.

That explanation is at odds with the fact that Lucard entered the Senate Wing through a broken window just three minutes after the second breach of that area (wherein police officers holding the Senate Wing door were forcibly pushed back and overwhelmed by an angry mob).

Lucard stated that he stood around and talked to people who were inside the building.  The CCTV video, however, shows him pointing at the officers and apparently yelling and chanting at them as well in the lobby inside the Senate Wing Door.  Lucard admitted that he took a few videos with his phone, and that he deleted these videos in the months following January 6, 2021 because he did not "feel right" having them on his phone.  But he likely deleted those videos to avoid incrimination, because he also admitted he did not take any selfies inside the Capitol because that seemed "dumb" and "self-incriminating."

Lucard stated that he exited the building, then went in again this time accompanied by Brian Stenz.  Lucard stated that Stenz had not wanted to enter the building before, but that Lucard told Stenz that the "police were being cool with everybody" and that he didn't think it was a problem to go inside.  Lucard stated that he and Stenz walked down a hallway and stood around for a few minutes then exited.  Not until specifically questioned about it did he admit that he had entered Senator Merkley's office, but claimed that he had not known at the time that it was an office.

Lucard stated that he regretted going into the Capitol building on January 6, 2021 and that he "wasn't thinking."  He claimed he did not know that other rioters intended to stop the certification of the electoral votes.

Although Lucard claimed to regret his actions on January 6, 2021, his minimization of his conduct and the threat of the violent crowd to the police belies this assertion.

*The Charges and Plea Agreement*

On March 16, 2022, Lucard was charged by information with one count of violating 40 U.S.C. § 5104(e)(2)(G).  On March 25, 2022, he pleaded guilty pursuant to a plea agreement to Count One of the Information. In his plea agreement, Lucard agreed to pay $500 in restitution to the Department of the Treasury.[6]

### III.    Statutory Penalties

Lucard now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Lucard faces up to six months of imprisonment and a fine of up to $5,000.  Lucard must also pay restitution under the terms of his

---

[6] At the time of his plea agreement, the amount of damages to the U.S. Capitol was estimated to be $1 million.  That amount has subsequently changed.

plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, many of the Section 3553(a) factors weigh in favor of a sentence of 30 days incarceration followed by 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Lucard's individual conduct, the Court should assess that conduct on a spectrum.  In determining a fair and just sentence on this spectrum, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Lucard personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of Lucard is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Lucard from most other misdemeanor defendants.  Lucard's lack of violence and property destruction explains why he was charged with, and permitted to plead to, only a misdemeanor rather than a felony.

Lucard travelled almost 150 miles to participate in the riot at the Capitol on January 6.  Once there, he entered the Capitol Building through the Senate Wing door not once but twice – the first time leaving his friend Brian Stenz outside, and the second time entering with Stenz.  Lucard's conduct inside the building is more troubling than those who simply marched through

the Crypt or the Rotunda.  During his first trip, Lucard chanted and pointed at U.S. Capitol police officers guarding the Senate Wing door.  During his second trip, Lucard and Stenz made their way into the personal office of Senator Merkley.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Lucard's History and Characteristics

Lucard is a 27-year-old man from Chestnut Hill, Pennsylvania, who is currently employed as a home healthcare giver for his father.  He does not have a criminal record. Lucard has been compliant with the conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of home detention.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be

16

deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lucard's brazen actions – entering the U.S. Capitol building not once but twice, yelling and chanting at the police, and entering into the personal office of a Senator – all cry out for a message of specific deterrence that would discourage Lucard from committing similar crimes in the future.  Upon exiting the building after his first trip inside, Lucard told his friend, Brain Stenz, that it was okay to go inside, spurring Stenz to enter with Lucard.  Lucard also likely witnessed violence or at least the signs of it before entering the Capitol but chose to do so anyway.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[8]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Lucard has pleaded guilty to Count One of the Information, charging him with parading, demonstrating, or picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law

enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court, and this Court, have sentenced Capitol breach defendants who spent time in sensitive places within the Capitol.  A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda.  A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.  That person's presence is even more disruptive.  An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk.  *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2.  That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.  As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns.

The most obvious case for comparison is that of Lucard's friend, Brian Stenz (21-CR-000456 (BAH)), with whom he traveled to Washington, D.C. and entered the Capitol building.  This Court sentenced Stenz to 14 days' incarceration as a condition of a period of probation of 36 months.  Although Lucard does not have a criminal record like Stenz, Lucard entered the U.S. Capitol for the first time by himself, then for a second time with Stenz, whereas Stenz only entered once.  Additionally, Lucard aggressively chanted at police officers, as seen in Exhibit 1, whereas Stenz did not.

In *United States v. Andrew Ericson*, *Ericson* went to the Speaker's Conference Room where he posed for a selfie, as well as for a photograph resting his feet on the conference table, took a beer from a mini-fridge, and posted his involvement to social media. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence.  You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it."  *Ericson,* Tr.

12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.* The government has not uncovered any evidence that Lucard, unlike Ericson,  engaged in destruction while in Senator Merkley's office.  However, Lucard entered the building twice and interacted directly with police officers, unlike Ericson.  This suggests that a sentence of incarceration for Lucard that is comparable to the 20 days Ericson received would avoid unwarranted sentencing disparities.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol. Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing.  Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6.  Mazzocco took photographs of himself smirking during the riot and posted them to social media. By contrast, Lucard did not post photographs to social media, but unlike Mazzocco, he entered the building twice and aggressively interacted with law enforcement.

The government acknowledges that defendant Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC).  Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment.  *Marquez,* Tr. 12/10/21 at 32, 34, 37.  Conversely, Lucard has no history of mental-health issues, and also acted aggressively towards law enforcement.

One other defendant, Gary Edwards, who also entered Senator Merkley's office, received a probationary sentence. Edwards was a 68-year-old retiree with no criminal record who was in the senator's office for less than one minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB)*.* Unlike Edwards, Lucard acted aggressively towards the police, and entered the building twice.

Lucard's choice to enter the Capitol twice is significant. In a similar case, *United States v. Croy* (21-cr-162 (BAH)), this Court sentenced the defendant to 14 days' confinement in a community corrections facility, 36 months' probation, and 90 days of home detention. Like Lucard, Croy entered the Capitol twice, but unlike Lucard, he did not enter into a sensitive area of the building. Similarly, this Court sentenced Richard Watrous to 14 days of intermittent confinement, 36 months' probation, and 2 months of home detention. *See United States v. Watrous*, 21-cr-627 (BAH). Watrous entered the building twice, saw destruction before entering, and minimized his conduct, but unlike Lucard he did not enter into a sensitive area.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.       The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[9] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[10]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[9] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[10] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

      *2.  Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[11]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[11] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[12]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in the defendant's case given the requested 20-day imprisonment sentence.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Carson S. Lucard to 30 days' incarceration followed by a period of probation of 36 months, sixty hours of community service, and order him to pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on

---

[12] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Lucard's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Grace Albinson*
GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On June 10, 2022, a copy of the foregoing was served on counsel of record for the defendant via the Court's Electronic Filing System.

/s/ *Grace Albinson*
GRACE ALBINSON
Trial Attorney
Capitol Riot Detailee
